Approved: _____
          MITZI S. STEINER
          Assistant United States Attorney

Before:   THE HONORABLE SARAH L. CAVE
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :      **22 MAG 352**
                              :
     - v. -                   :      **SEALED COMPLAINT**
                              :
ASHINE MCRAE,                 :      Violations of
     a/k/a "Po"               :      18 U.S.C. §§ 922,
     a/k/a "Avery"            :      924(c)(1)(A)(i), and 2;
                              :      21 U.S.C. § 846
                              :
                              :      COUNTY OF OFFENSE:
                 Defendant.   :      NEW YORK
                              :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     PATRICK DALY, being duly sworn, deposes and says that he is a Detective with the New York City Police Department (the "NYPD"), and charges as follows:

## COUNT ONE
### (Narcotics Conspiracy)

     1.   In or about September 2021, in the Southern District of New York and elsewhere, ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

     2.   It was a part and an object of the conspiracy that ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

     3.   The controlled substances that ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, conspired to distribute and to

possess with intent to distribute, were (i) 100 grams or more of mixtures and substances containing a detectable amount of heroin, and (ii) 40 grams or more of mixtures and substances containing a detectable amount of N-phenyl-N-[ 1-(2-phenylethyl)-4-piperidinyl] propanamide, also known as "fentanyl," in violation of Title 21, United States Code, Section 841(b)(1)(B); and a quantity of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(C).

> (Title 21, United States Code, Section 846.)

## COUNT TWO
### (Using, Carrying, and Possessing a Firearm During, in Relation to, and in Furtherance of a Drug Trafficking Crime)

4. In or about September 2021, in the Southern District of New York and elsewhere, ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the narcotics conspiracy charged in Count One of this Complaint, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm.

> (Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

## COUNT THREE
### (Felon in Possession)

5. In or about September 2021, in the Southern District of New York and elsewhere, ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed ammunition, to wit, four rounds of 9 mm Luger ammunition, which were in and affecting interstate and foreign commerce.

> (Title 18, United States Code, Section 922(g)(1).)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

6. I am a Detective with the NYPD, and I have been personally involved in this investigation. This affidavit is based on my investigation, my conversations with other law enforcement officers and other individuals, and my examination of reports and

records.  Because this affidavit is being submitted for the limited
purpose of establishing probable cause, it does not include all
the facts that I have learned during the course of my
investigation.  Where the contents of documents and the actions,
statements, and conversations of others are reported herein, they
are reported in substance and in part, except where otherwise
indicated.

<u>Prison Calls Between MCRAE, CC-1, CC-2, and CC-3</u>

        7.   Based on my review of recorded prison calls, my
conversations with other law enforcement officers, my review of
law enforcement records, and my involvement in this investigation,
I have learned that between on or about November 24, 2020, and on
or about December 1, 2020, ASHINE MCRAE, a/k/a "Po," a/k/a "Avery,"
the defendant, while incarcerated on unrelated charges, exchanged
a series of prison calls regarding narcotics transactions, which
were recorded, before MCRAE was subsequently released from custody
on or around July 8, 2021.  Specifically, I have learned among
other things, the following:

        a.   On or about November 24, 2020, during a
recorded call, MCRAE informed a coconspirator ("CC-1"), in
substance and in part, that CC-1 should instruct another
coconspirator ("CC-2") to "take over the block, I mean he was
already doing business."  MCRAE further instructed CC-1, in
substance and in part, to inform CC-2 to "collect the money" from
specified individuals and to "tell [CC-2 to] take my money that's
out there and put it with his money."  Based on my training and
experience, and involvement in this investigation, I believe that
MCRAE was instructing CC-1 to inform CC-2 to manage MCRAE's
narcotics transactions and related finances while MCRAE remained
incarcerated.

        b.   On or about November 25, 2020, during a
recorded call, MCRAE inquired whether a coconspirator ("CC-3"), in
substance and in part, was "on the block already" and to not "let
nobody know where your [sic] stashing your shit, or anyone know
how you stash your shit."  CC-3 further informed MCRAE, in
substance and in part, that "shit was gone mad quick" and that
CC-3 would be "holding everything down" in MCRAE's absence.  Based
on my training and experience, and involvement in this
investigation, I understand MCRAE and CC-3 to be discussing
narcotics sales, the increasing demand for narcotics, and CC-3's
role in maintaining the narcotics operation while MCRAE was in
custody.

        c.   On or about November 26, 2020, during a
recorded call, MCRAE discussed with CC-2, in substance and in part,
the pricing for narcotics and the compensation for narcotics
workers.  Specifically, MCRAE informed CC-2, in substance and in
part, that CC-2 should pay "two thousand dollars" in exchange for
"fifty" or a "hundred."  MCRAE further informed CC-2 that the
"fifty I can get it loose or I can get it put together" and that
"I take it put together because I do like two hundred a day so I
see this nigga twice a day, every time he give me fifty I only
give him back two thousand."  Based on my training and experience,
and my involvement in this investigation, I believe MCRAE was
informing CC-2 how to purchase narcotics for redistribution,
including the amount and cost for each narcotics purchase.  CC-2
further informed MCRAE that "I told them . . . I'm going to give
you all forty because its Thanksgiving coming and Christmas coming"
and that after the holidays "it's going to thirty."  Based on my
training and experience, and my involvement in this investigation,
I understand CC-2 to be informing MCRAE that he intended to
increase payment to individuals working to sell narcotics on their
behalf over the holidays and to subsequently lower their wages.

<u>MCRAE Shooting</u>

        8.   Based on my training and experience, my
participation in this investigation, including my personal
observations, physical surveillance, my conversations with other
law enforcement agents, my review of law enforcement reports and
records, and my review of other materials specified below, I have
learned the following, among other things:

        a.   ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the
defendant, CC-1, CC-2, CC-3, and another co-conspirator who is CC-
2's son ("CC-4") are members of a narcotics crew that primarily
distributes narcotics at two locations in New York, New York namely
between Second and Third Avenue on East 122nd Street
("Location-1") and in and around 2253 3rd Avenue, which is
approximately 200 feet from Location-1 ("Location-2").

        b.   On or about September 6, 2021, at
approximately 11:13 p.m., law enforcement responded to a shot
spotter activation at the rear of 220 East 123rd Street, which is
around the corner from Location-1 and Location-2.  Law enforcement
recovered four rounds of ammunition, namely 9 mm Luger shell
casings, in the immediate vicinity.  Law enforcement subsequently
reviewed video footage of the area (the "Video") which depicted a
male individual wearing a white tank top and boots with what
appears to be a firearm in his hand shooting at an unknown target.
Based on my involvement in several prior unrelated law enforcement

encounters with MCRAE between in or about 2019 and in or about 2021, and my review of the Video, I have determined that the individual depicted in the Video wearing a white tank top and boots and holding what appears to be a firearm is the same individual I previously encountered, namely, MCRAE. Following the shooting, law enforcement responded to the scene. Law enforcement officers interviewed MCRAE, who provided law enforcement with a phone number ("Phone Number-1") as his personal phone number.

9. Based on my review of criminal history records, I have learned, among other things, that on or about January 20, 2016, ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, was convicted in New York County Supreme Court of criminal possession of a controlled substance in the third degree, in violation of New York Penal Law Section 220.16(1), a felony that carries a maximum term of imprisonment of 25 years, and was sentenced to three years' imprisonment.

10. Based on my review of information provided by a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives who is familiar with the manufacturing of firearms and ammunition, I have learned that the ammunition recovered from the shooting was manufactured outside of New York State.

## Co-Conspirator Narcotics Sales

11. Based on my training and experience, my participation in this investigation, including my personal observations, physical surveillance, my conversations with other law enforcement agents, including consensual recordings of at least some of the communications described below, my review of law enforcement reports and records, and my review of other materials specified below, I have learned the following, among other things:

a. On or about September 1, 2021, at approximately 4:00 p.m., during a recorded conversation, an undercover law enforcement officer (the "UC") met with CC-4, at Location-2. Specifically, CC-4 stated, in sum and substance, that he was available to conduct narcotics transactions involving crack cocaine. CC-4 and the UC also agreed upon a specific price for a future narcotics transaction. CC-4 further provided the UC with a phone number ("Phone Number-2") for the UC to use to contact CC-4 when the UC was ready to proceed with a narcotics transaction.

b. On or about September 2, 2021, at approximately 8:20 p.m., the UC met with an individual ("Individual-1") at Location-2. Specifically, law enforcement observed CC-2 hand an unidentified item to Individual-1 in the

immediate vicinity of Location-2. Individual-1 then immediately
proceeded to approach the UC and hand the UC approximately 10 grams
of a tan, powdery substance in exchange for $600 of pre-recorded
money. The substance was subsequently lab tested and tested
positive for the presence of fentanyl.

c. On or about September 9, 2021, at
approximately 3:38 p.m., the UC contacted CC-4 through Phone
Number-2 and stated, in sum and substance, that he was interested
in purchasing "hard," which based on my training and experience,
I understand to be a reference to crack cocaine. CC-4 further
inquired as to the amount of narcotics that the UC wished to
purchase, and the UC stated that the UC wished to purchase 40
grams. CC-4 indicated that he would be willing to proceed with
the narcotics transaction at the cost of $45 per gram. CC-4 and
the UC agreed to proceed with the narcotics transaction later that
day at approximately 6:00 p.m.

d. On or about September 9, 2021, at
approximately 5:14 p.m., law enforcement officers observed CC-4
leaving the second floor of Building-1, where Apartment-1,
discussed *infra*, is located, and exit Building-1. CC-4 then
proceeded to Location-2, which is approximately 0.2 miles from
Apartment-1, where CC-4 handed the UC approximately 40 grams of a
white, rocky substance in exchange for $1,800 of pre-recorded
money. The substance was subsequently field tested and tested
positive for the presence of crack cocaine.

e. Between on or about July 18, 2021 and on or
about September 10, 2021, MCRAE through Phone Number-1 exchanged
at least approximately thirty-nine calls with CC-4 through Phone
Number-2. On or about August 29, 2021, MCRAE using
Phone Number-1 sent a text message to CC-4 through Phone Number-2
and stated, in sum and substance, "[t]here's no more down so if
you still have you got a mean crowd out here." Based on my training
and experience and my involvement in this investigation, I believe
that "down" is a reference to heroin and that MCRAE is informing
CC-4 that they were low in their narcotics supply.

<u>Residential Search of CC-2 and CC-4</u>

12. On or about September 15, 2021, law enforcement
executed a judicially-authorized search warrant on the apartment
where CC-2 and CC-4 reside ("Apartment-1"). CC-2 and CC-4 were
present in Apartment-1 at the time of the search. Based on my
participation in this investigation, including my personal
observations and my conversations with other law enforcement
agents, I have learned that during law enforcement's search of

Apartment-1, law enforcement observed, among other things, the following:

        a.   CC-4 was present in a bed (the "Bed") in a bedroom ("Bedroom-1") at the time law enforcement made entry of Apartment-1. Law enforcement subsequently located in Bedroom-1 CC-4's personal identification card, as well as clothing items that appeared to belong to him.

        b.   CC-2 was present in a second bedroom ("Bedroom-2") at the time law enforcement made entry of Apartment-1. Law enforcement subsequently located in Bedroom-2 mail addressed to CC-2, as well as CC-2's personal identification card and clothing items that appeared to belong to him.

        c.   A loaded .22 caliber Jennings firearm was located in a Timberland boot (the "Boot") in Bedroom-1 next to the Bed. In addition, a backpack (the "Backpack") was located next to the Boot. The Backpack contained twenty-six rounds of ammunition.

        d.   A closet ("Closet-1") was located next to the Bed in Bedroom-1. Sixteen 9mm Luger cartridges, contained inside of an ammunition box, in addition to three Glock magazines, were located inside of Closet-1.

        e.   A second closet ("Closet-2") was located adjacent to the living room. Three .25 caliber rounds and three .32 caliber rounds were located inside of Closet-2 next to a stamp and ink pad, which, based on my training and experience, appear to have been used to stamp heroin.

        f.   A safe within Bedroom-2 contained $19,963 in cash. In addition, $781 in cash was recovered from the Backpack in Bedroom-1.

        g.   Several narcotic substances were located within Bedroom-1 and Bedroom-2, including, among other things, the following:

            i.   258 glassines containing a tan, powdery substance, which, based on my training and experience, I believe to be heroin;

            ii.   35 vials containing a white, rocky substance, which, based on my training and experience, I believe to be crack cocaine;

iii.     One and a half pounds of a green vegetive substance contained in a vacuum-sealed plastic wrap which, based on my training and experience, I believe to be marijuana.

iv.     127 grams of a white, rocky substance contained in a clear, plastic bag, which, based on my training and experience, I believe to be crack cocaine;

v.     96 grams of a brown, powdery substance contained in a clear, plastic bag, which, based on my training and experience, I believe to be heroin;

vi.     1382 glassines of a tan, powdery substance, which, based on my training and experience, I believe to be heroin;

vii.     49 vials of a white, rocky substance, which, based on my training and experience, I believe to be crack cocaine;

viii.     A blender containing a tan, powdery residue, which, based on my training and experience, I believe to be heroin; and

ix.     Additional narcotics paraphernalia, including two scales, two concealed hidden compartment containers, and two heroin stamps with the imprints "New Arrival" & "Boomanati."

13.  Based on my review of law enforcement records, I know that the narcotic substances recovered from Apartment-1 tested positive for at least 100 grams of heroin, 40 grams of fentanyl, and 100 grams of cocaine.

## Surveillance of MCRAE's Residence

14.  Based on my review of law enforcement databases, I know that ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, receives mail at an apartment ("Apartment-2") located at 2370 2nd Avenue ("Building-1"), which is located approximately 0.2 miles from Location-1 and Location-2.

15.  Based on my involvement in this investigation, my personal observations, my conversations with other law enforcement officers, including those engaged in physical surveillance, my review of law enforcement reports and records, my review of video surveillance footage, and my training and experience, I have learned the following in substance and in part:

a. On or about December 21, 2021, at approximately 8:24 a.m., ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, was observed on surveillance video entering the elevator on the tenth floor of Building-1, the same floor where Apartment-2 is located. MCRAE then exited the elevator and proceeded to exit Building-1 with a large black plastic bag in his left hand and a smaller black plastic bag in his right hand. Law enforcement then observed MCRAE proceed on 2nd Avenue towards East 122nd Street, where Location-1 is located, with a small plastic bag in his right hand.

b. On or about January 4, 2022, at approximately 1:52 p.m., MCRAE was observed on surveillance video entering the elevator on the tenth floor of Building-1, the same floor where Apartment-2 is located. MCRAE then proceeded to exit the lobby of Building-1.

c. On or about January 4, 2022, at approximately 5:40 p.m., MCRAE was observed on surveillance video reentering the elevator in the lobby of Building-1 with a black plastic bag in his left hand accompanied by another male individual ("CC-5"), who was carrying a blue plastic bag. MCRAE and CC-5 then exited the elevator on the tenth floor of Building-1, the same floor where Apartment-2 is located. CC-5 stood next to the emergency exit in the stairwell on the tenth floor of Building-1. MCRAE, who was then carrying both the black and blue plastic bags, proceeded to Apartment-2 and used his keys to open the front door and enter Apartment-2. MCRAE subsequently exited Apartment-2 into the hallway and unzipped his jacket and unclipped his belt. MCRAE then reached into his groin area and removed a clear plastic bag, which based on my training and experience and involvement in this investigation, I believe to be drug packaging. MCRAE then opened the bag and proceeded to count out a number of items, which based on my training and experience and involvement in this investigation, I believe to be vials of narcotics. MCRAE then placed the plastic bag back into his sweatshirt pocket, while holding a number of apparent vials in his right hand. MCRAE proceeded into the stairwell of the tenth floor and then returned to reenter Apartment-2.

d. On or about January 4, 2022, at approximately 6:10 p.m., MCRAE was observed on surveillance video opening the door of Apartment-2, while holding several items in his hand, which based on my training and experience and involvement in this investigation, I believe to be white glassines of heroin. An unknown male individual ("CC-6") approached MCRAE at the door of Apartment-2 and appeared to exchange U.S. currency for glassines of heroin from MCRAE.

e.   On or about January 4, 2022, at approximately 7:05 p.m., MCRAE was observed on surveillance video exiting Apartment-2 and having a brief conversation with an unknown male individual ("CC-7") who was standing inside the stairwell of the tenth floor.   MCRAE informed CC-7, in sum and substance, that "that's the last of it," which based on my training and experience and involvement in this investigation, I believe to be a reference to MCRAE's narcotics supply in Apartment-2.   CC-7 then handed MCRAE what appears to be a large sum of U.S. currency.   MCRAE then returned to Apartment-2.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of ASHINE MCRAE, a/k/a "Po," a/k/a "Avery," the defendant, and that he be imprisoned or bailed, as the case may be.

**/s Patrick Daly** (By Court with Auth)
_____
PATRICK DALY
Detective
NYPD

Sworn to me through the transmission of this Complaint by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this

<u>12th</u>day of January, 2022

_____
THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK